CORA DOANE BERNDT, Appellee, v. OTTO H. BERNDT, Appellant.

**HUSBAND AND WIFE:** Separate Maintenance—Evidence. Evidence reviewed, and held quite insufficient to justify a decree for separate maintenance.

*Appeal from Hardin District Court.*—R. M. WRIGHT, Judge.

MARCH 11, 1924.

REHEARING DENIED JUNE 28, 1924.

SUIT for separate maintenance. There was a decree for the plaintiff, and defendant appeals.—*Reversed.*

*Lee & Garfield* and *Williams & Steinberg,* for appellant.

*Charles L. Hays* and *Herbert A. Huff,* for appellee.

EVANS, J.—The parties hereto were married September 6, 1921. The plaintiff was a school-teacher, and the defendant a carpenter by trade. Each was about 40 years of age. They had been acquainted 2 or 3 years. Immediately after the marriage, they started by automobile for Florida, where the defendant expected to find winter work in his trade. They carried a camping outfit, and arrived at their destination in about one month. The defendant obtained work at West Palm Beach, where most of their time in Florida was spent. They returned to Hardin County by the same method of travel, and arrived in March, 1922. They lodged with some friends for a short time, and then

rented a furnished room and took their meals at a restaurant. The defendant was busying himself in obtaining work for the summer and in preparation therefor. This suit was begun by the service of notice on the morning of April 15, 1922, immediately after breakfast, and before the defendant left for his place of work. The trouble which developed between these parties would be ludicrous, if it were not so serious in its consequences. We cannot better indicate the general nature of this trouble than by setting forth the plaintiff's own version of what she calls "first real difficulty." This occurred in Florida, within a month or two after their arrival there. She testified:

"The first real difficulty between Mr. Berndt and I was when Mr. Berndt got some meat for dinner, and he said he was not hungry. He said we could have dinner about 4 o'clock. Well, I got some lunch for myself about 12, and did not wait until 4 o'clock for my dinner, and then, as he said, he drove down and got meat and brought it back. Of course, I wasn't hungry then, but I was a little angry because he hadn't gotten the meat for dinner. On the way down, he talked in a way I did not like, and he lied to me. Then later in the evening, he skipped off and left me. He told me he was not going away, and he left, and I went out to find him, and he was out along the canal. Q. Did anything else occur there? A. Yes, we had a quarrel right then. Q. What was done, if anything? A. I struck him in the chest. I told him that he could not lie to me. And then he grabbed me and twisted me so that it twisted my back, and I told him he shouldn't do that, because I had so much trouble with my back anyway; and then in a little while he grabbed me again, and almost threw me into the ditch by the side of the canal, and then ran off home and left me. It was about a block and a half home. It was late at night. The people had all gone to bed."

### Cross-examination.

"* * * So I went out on the porch, and he wasn't there. Then I walked down toward the canal, and he was going toward the house. He hadn't been gone very long. We had some words during the day, and I suppose I was angry. I said to him, 'You cannot lie to me;' and then I struck him in the chest

with my fist. He wouldn't go for a walk with me after that. He wanted to be stubborn.''

The defendant's version of the same event is as follows:

''I remember the trouble that we had one evening at West Palm Beach. We had been sitting in the house about all day, and I said: 'Let's go out and sit on porch,' 'No,' she says, 'I don't want to go.' Well, I asked her again to go out and sit on the porch. It was a nice evening. And she said: 'No, I don't want to go.' 'Well,' I says, 'I believe I will go out and sit there a while.' She says, 'No, you won't.' I said, 'Why not?' 'Well,' she says, 'because you won't.' I just got up and started for the door, but she beat me to the door, and stood in front of the door and wouldn't let me out. So I went back and sat down. Finally I got up again, in about ten or fifteen minutes. She said, 'Where are you going?' I said, 'I am going to the toilet.' And she let me go. And I went to the toilet, and there was someone in there, and I went right on out— right out the back door. Then I went down the street about three blocks, and right back toward the house; and when I got within a block from the house, she met me, walking as fast as she could go; and when she came up to where I was, she started to striking me with her fist, and hit me a few times on the breast, and one time just lightly in my face; and then I grabbed hold of her hand. I said: 'What's the matter with you?' She said: 'You can't lie to me.' I said, 'How did I lie?' 'Well,' she said, 'you told me you were going out to the toilet.' 'Well,' I said, 'I went to go out to the toilet, but there was someone in there, so I went right on out.' ''

On the way home from Florida, and while camping at Anniston, Georgia, they had a difficulty which is described by plaintiff in her testimony as follows:

''At times my husband would get stubborn, and refuse to talk, and would stay stubborn for four or five days, and I would have to carry on the conversation. Sometimes I talked to him and he wouldn't answer me. I have talked to him sometimes away into the middle of the night. I hit him with a rubber-soled slipper when we were on the way home. That was when he met a man and his wife who were camping near us. They

wanted my husband to wake them up early in the morning, so we could get an early start. That night, I was sitting at the side of the bed. Mr. Berndt was lying down, and I was taking off my shoes. We had some conversation, and I hit him with my shoes, and he reached over and grabbed me and doubled me over on the bed backwards and hurt my back.''

The defendant's version was as follows:

''When we were on the way home to Iowa, we were camping at Anniston, Georgia, and a party there asked me the directions to Chicago, and he said one of his main troubles in traveling was to get up early, and he asked me to call him in the morning. My wife did not want me to call them, and she fussed around until 3 o'clock in the morning, saying that I didn't need to call those folks. Then she hit me with her slipper, when I told her that I would call them if I wakened before they did.''

After arriving at Eldora, where they proposed to live, further difficulties occurred. They were not essentially different in their nature nor more substantial in their causes than is indicated in the foregoing excerpts from the testimony of the parties. Lightfield, at whose home the parties stayed a part of the time, testified:

''I have observed Mrs. Berndt following Mr. Berndt all over town. She wouldn't let him get out of her sight. At my house she would follow him in the basement and upstairs. It didn't make any difference. * * * One time Mr. Berndt went to the livery barn to a market-day sale, and his wife followed him all through the crowd. There were several hundred men in that crowd. I have also seen her following him all over the streets of Eldora, a great many times.''

The Snyders, in whose home they had a rented furnished room, testified to their observations of conduct of the parties. They occupied a room upstairs in the Snyder home. Mr. Snyder testified:

''I could hear Mrs. Berndt talking most of the time. Mr. Berndt was a very quiet man, and never said very much.''

Mrs. Snyder testified:

''I used to hear Mrs. Berndt talking to her husband, but I never heard him talking back to her. Most of the talking was

being done by Mrs. Berndt, and it sounded like she was scolding him."

Nina Snyder testified:

"I could hear the conversation upstairs in their bedroom, through the register. I never heard Mr. Berndt do much talking, but I could hear her scolding and talking all the time. She was scolding or acting as if there was something wrong all the time. I used to hear them upstairs every night. It sounded to me as if she was scolding him all the time. I never heard him talk back to her. She told me that she was a school-teacher, and didn't intend to cook for anyone. I told her that she ought to have thought of that before she got married. She told me that she wouldn't cook for her husband. I recollect that he couldn't go any place without she always wanted to go with him. He never could go down town or anywhere but what she was always after him. I saw that."

### Cross-examination.

"I could hear them talking when the door was open. She always wanted to go with him wherever he went. I think there were very few times that she didn't go with him. I was home most of the time, and whenever he wanted to leave, she wanted to go with him."

In response to Lightfield's testimony, the plaintiff testified as follows:

"I didn't think that it was improper for me to go among those men at the public sale. I wasn't looking at the men, and I was not looking at the stock. I didn't care anything about either, except my husband. I went with him a great many times."

The plaintiff testified that, in her altercations with her husband, he beat her and kicked her severely. The defendant denies emphatically that he ever struck or kicked her in his life, and says, in substance, that the only force that he ever exerted upon her was in resistance to aggressive attacks by her, and in an attempt only to hold her hands. The plaintiff has no corroboration for her testimony in that regard, unless it be that the existence of the black and blue spots upon her person are a sufficient corroboration thereof. Her sister testified:

''She said that the bruised places on her chest were where Mr. Berndt hit her. She said that her husband hit her with his elbow. * * * I don't know how large the bruised spots were. They looked like common, ordinary black spots, and she told me that her husband had kicked her there.''

Similar testimony was given by the nurse. She also testified:

''They were old bruises. There was one on her back down near the lower part of the back. * * * There were several bruises on her limbs. Her flesh is flabby, and not muscular; and a person who has a flabby thigh and soft tissues there, if they run into a table or something like that, they are quite apt to have a discoloration like that.''

There is no stronger corroboration than the foregoing. After the beginning of this suit, and in July following, the plaintiff suffered a miscarriage of a four months' foetus.

The decree for plaintiff necessarily implies that the troubles complained of arose without substantial fault on her part. In our judgment, such finding is impossible, upon this record. Not only was she in fault in precipitating these events, but she was grossly in fault. In that regard it matters little whether we look to her testimony or to that of the defendant. Only one hypothesis is conceivable as excusing or mitigating her conduct, and that is the possibility of mental disorder. This explanation is not contended for by her nor by her counsel for her. It is, therefore, forbidden to us to indulge in it. The evidence shows that, shortly before the suit was begun, her husband had tried to induce her to go to a sanatorium; but this suggestion was resented, and it is now urged against him as evidence of an attempt to disparage her or to separate from her. The suggestion on his part was not discreditable to him. The evidence shows that, prior to her marriage, she had suffered more or less ill health, and had undergone a surgical operation, the nature of which is not disclosed. Her testimony also shows that her health since marriage has not been rugged. The nurse who was called by her as a witness testified that the plaintiff used ''pain pills'' of different kinds, and that these were narcotic. She testified:

"She has had a great deal of pain. She has a great capacity for pain pills to alleviate her pain."

She also testified that plaintiff was a habitual user of such pills. But no excuse is made in her behalf on this ground. Her pregnancy might account for her nervous excitement and disorder, and would be a substantial mitigating circumstance. But this did not exist until within the last month prior to the beginning of the suit. It could, therefore, afford no excuse for previous conduct. We are, therefore, forced by this record to judge of the conduct of the plaintiff upon the assumption that she is not suffering from any mental or nervous disorder. Upon that assumption, we are compelled to say that her conduct has been extremely blameworthy, nor are we permitted to say, upon her uncorroborated testimony, that her husband beat her or kicked her. Even if corroboration were not legally necessary, under the statute, we should yet be compelled to say that the evidence of the husband is more consistent with all the circumstances appearing, and therefore more credible than hers.

It is manifest to us that the bringing of this suit was a grave mistake, both on her own part and on the part of her friends, if any, who counseled it. It has added much to the difficulty of condonation and patience, which still rests as a duty upon both parties. We cannot by a reversal restore the parties to as good a status as they had before the suit was commenced. The mutual performance of their marital vows will be all the more difficult because of this litigation. Our duty, however, is clear, though we perform it with a degree of reluctance. The decree below must be and is reversed, and plaintiff's petition is dismissed.—*Reversed.*

ARTHUR, C. J., PRESTON and FAVILLE, JJ., concur.